JUDGE ROBINSON

**ORIGINAL**

**05 CV 9680**

Andrew J. Frackman (AF4276)
Kenneth Marvet (KM8800)
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone:    (212) 326-2000
Facsimile:    (212) 326-2061

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NAVDEEP SINGH,

               Plaintiff,

           -against-

GLENN S. GOORD, Commissioner Department
of Correctional Services, WILLIAM MAZZUCA,
former Superintendent, Fishkill Correctional
Facility, LARRY ZWILLINGER, acting
Superintendent, Fishkill Correctional Facility,
PAUL ANNETTS, Superintendent, Downstate
Correctional Facility, WOHLRAB, Lieutenant,
Downstate Correctional Facility, COMMIA,
Correctional Officer, Downstate Correctional
Facility, LYNCH, Correctional Officer, Fishkill
Correctional Facility, LARKIN, Deputy, Fishkill
Correctional Facility, MENDOZA, Correctional
Officer, Fishkill Correctional Facility,
DIGIROLAMO, Correctional Officer, Fishkill
Correctional Facility, MONZILLO, Correctional
Officer, Fishkill Correctional Facility,
STEWART, Correctional Officer, Fishkill
Correctional Facility, TABOR, Correctional
Officer, Fishkill Correctional Facility, K.
EMMINGER, Correctional Officer, Fishkill
Correctional Facility, MICHELLE P. STONE,
head of the Inmate Grievance Program at Fishkill
Correctional Facility, and JOHN DOE #1-6,

               Defendants.

Case No.

**COMPLAINT**

## INTRODUCTION

1.      This is an action brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 2000cc ("RLUIPA"), the laws and the Constitution of the United States, and the Constitution of the State of New York, to permit Navdeep Singh ("Navdeep") to practice his religion while incarcerated. As a devout Sikh, Navdeep is obligated to follow all of the teachings of the Sikh religion. Defendants have unjustifiably and unlawfully imposed on Navdeep unwarranted restrictions on his religious practices. RLUIPA, in particular, prohibits defendants from imposing a substantial burden on Navdeep's religious exercise unless the burden furthers a compelling government interest and is the least restrictive means of furthering that interest. No such justification exists for the burdens imposed by defendants on Navdeep in this case.

2.      The burdens and limitations imposed by defendants on Navdeep are particularly unjustified because they are inconsistent with accommodations which The New York State Department of Correctional Services ("DOCS") has made for other incarcerated persons of other religious groups, including Christians, Muslims, Jews, Native Americans, and Rastafarians, to name a few.

3.      DOCS Directive 4202 provides that the Department "attempts to identify particular faiths within the inmate population in an effort to accommodate the legitimate spiritual needs of its inmates as reasonably as possible." Consistent with Directive 4202, DOCS, for example, permits a Native American inmate to possess several religious items including a medicine bag, an American Rosette on a fabric or leather cord, sacred herbs, smoking pipe and religious artifacts and symbols. In contrast, defendants have prevented Navdeep from possessing essential religious items, including without limitation, the *Kara*, a thin cast-iron or steel bracelet worn by Sikhs at all times. Similarly, DOCS permits a Christian inmate to wear a cross pendant, but refuses to permit Navdeep to wear a *Khanda*, the Sikh pendant.

4.      Navdeep seeks the right to practice his religion and an order requiring DOCS to grant all of his reasonable requests for religious accommodations, as required by RLUIPA, DOCS' own Directive, the Constitution of the United States, and the Constitution of the State of New York.  These requests fall into three general categories, Navdeep requests: (a) the right to possess his religious articles, books, and pendants; (b) that these items be treated with respect; and (c) that he be provided reasonable accommodations so that he can practice Sikhism, such as set times for prayer and a vegetarian diet.

## JURISDICTION AND VENUE

5.      This action arises under 42 U.S.C. § 1983, 42 U.S.C. 2000cc ("RLUIPA"), the laws and the Constitution of the United States, and the Constitution of the State of New York.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4) and 42 U.S.C. § 2000cc-2(a).  The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).  Jurisdiction to grant declaratory relief is conferred by 28 U.S.C. §§ 2201, 2202.  Injunctive relief is authorized under Rule 65 of the Federal Rules of Civil Procedure.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

7.      Upon information and belief, the Court has personal jurisdiction of the defendants because (a) they are residents of the state; (b) committed tortious acts within the state, or (c) committed tortious acts without the state causing injury within the state and regularly do business in the state.

## PARTIES

### Plaintiff

8.      Navdeep, an *Amritdhari* Sikh, is presently confined to the Fishkill Correctional Facility.  He was convicted of assault in the first degree and criminal possession of a weapon in

the fourth degree. He entered the custody of the New York City Department of Correction on January 26, 2005, to serve a five-year sentence.

**Defendants**

9.     Defendant Glenn S. Goord is Commissioner of DOCS and is responsible for all aspects of prison operations, including accommodation of prisoners' religious exercise. He is sued in his official capacity for injunctive relief.

10.     Defendant William Mazzuca was the Superintendent of Fishkill. He is sued in his official capacity and individually for damages. Mazzuca is directly responsible for the restrictions that Fishkill imposed on Navdeep's religious practices.

11.     Upon information and belief, defendant Larry Zwillinger is the acting Superintendent of Fishkill. He is sued in his official capacity for injunctive relief.

12.     Defendant Paul Annetts is the Superintendent of Downstate Correctional Facility ("Downstate"). He is sued in his official capacity and individually for damages. Annetts is directly responsible for the restrictions that Downstate imposed on Navdeep's religious practices.

13.     Defendant Lieutenant Wohlrab is a Hearing Officer at Downstate who presided at the disciplinary hearings for the misbehavior report with an incident date of February 14, 2005 and March 16, 2005. He is sued in his official capacity and individually for damages. Wohlrab is directly responsible for the restrictions imposed on Navdeep's religious practices.

14.     Defendant Commia is a Correctional Officer at Downstate. He is sued in his official capacity and individually for damages. Commia is directly responsible for restrictions imposed on Navdeep's religious practices.

15.     Defendant Lynch is a Correctional Officer at Fishkill. He is sued in his official capacity and individually for damages. Lynch is directly responsible for restrictions imposed on Navdeep's religious practices.

4

16.     Defendant Larkin is a Deputy at Fishkill. He us sued in his official capacity and individually for damages. Larkin is directly responsible for restrictions imposed on Navdeep's religious practices.

17.     Defendant Mendoza is a Correctional Officer at Fishkill. He is sued in his official capacity and individually for damages. Mendoza is directly responsible for restrictions imposed on Navdeep's religious practices.

18.     Defendant DiGirolamo is a Correctional Officer at Fishkill. He is sued in his official capacity and individually for damages. DiGirolamo is directly responsible for restrictions imposed on Navdeep's religious practices.

19.     Defendant Monzillo is a Correctional Officer at Fishkill. He is sued in his official capacity and individually for damages. Monzillo is directly responsible for restrictions imposed on Navdeep's religious practices.

20.     Defendant Stewart is a Correctional Officer at Fishkill. He is sued in his official capacity and individually for damages. Stewart is directly responsible for restrictions imposed on Navdeep's religious practices.

21.     Defendant Tabor is a Correctional Officer at Fishkill. He is sued in his official capacity and individually for damages. Tabor is directly responsible for restrictions imposed on Navdeep's religious practices.

22.     Defendant K. Emminger is a Correctional Officer at Fishkill. He is sued in his official capacity and individually for damages. Emminger is directly responsible for restrictions imposed on Navdeep's religious practices.

23.     Defendant Michelle Stone is the head of the Inmate Grievance Program at Fishkill. She is sued in her official capacity.

24.     Upon information and belief, John Doe #1 is a Sergeant at Downstate who signed the misbehavior report with an incident date of February 14, 2005. John Doe #1 is sued in his/her official capacity and individually for damages; John Doe #1 is directly responsible for restrictions imposed on Navdeep's religious practices.

25.     Upon information and belief, John Doe #2 is a Correctional Officer at Ulster Correctional Facility ("Ulster"). John Doe #2 is sued in his/her official capacity and individually for damages; John Doe #2 is directly responsible for restrictions imposed on Navdeep's religious practices.

26.     Upon information and belief, John Doe #3 is a hearing officer at Fishkill. John Doe #3 is sued in his/her official capacity and individually for damages; John Doe #3 is directly responsible for restrictions imposed on Navdeep's religious practices.

27.     Upon information and belief, John Doe #4 is a hearing officer at Fishkill. John Doe #4 is sued in his/her official capacity and individually for damages; John Doe #4 is directly responsible for restrictions imposed on Navdeep's religious practices.

28.     Upon information and belief, John Doe #5 is a Correctional Officer at Fishkill. John Doe #5 is sued in his/her official capacity and individually for damages; John Doe #5 is directly responsible for restrictions imposed on Navdeep's religious practices.

29.     Upon information and belief, John Doe #6 is a Correctional Officer at Fishkill. John Doe #6 is sued in his/her official capacity and individually for damages; John Doe #6 is directly responsible for restrictions imposed on Navdeep's religious practices.

30.     Upon information and belief, the Department of Correctional Services receives federal funds to assist in the operation of New York's correctional facilities.

## FACTUAL ALLEGATIONS

31.     Navdeep is an *Amritdhari* Sikh. *Amritdhari* Sikhs are men and women who have undergone the Sikh initiation ceremony, akin to a baptism, binding them to a life of discipline and piety. An *Amritdhari* Sikh is regarded as having reached the highest level of religious commitment. The following is a brief description of Sikhism and some of the requirements that Navdeep, as an *Amritdhari* Sikh, believes he must obey.

## I.     THE SIKH RELIGION AND ITS REQUIREMENTS FOR PLAINTIFF

32.     The monotheistic Sikh religion was founded in India in 1469 by Guru Nanak and its practices were built upon the teachings of the nine Gurus who succeeded him. Guru Gobind Singh was the last of the ten Gurus, and institutionalized the practices and beliefs of the faith. The teachings of Sikhism's ten Gurus are enshrined in the Sikh Scripture, the *Sri Guru Granth Sahib*. The *Sri Guru Granth Sahib* was first compiled in 1604, and finalized in the early 1700s before being bestowed the title of "Guru," or eternal enlightener, in 1708. Today, there are approximately 25 million Sikhs worldwide and it is one of the world's largest religions.

33.     Sikhs believe that the central teaching of the *Guru Granth Sahib* is a reflection on the ultimate Truth. As a result, Sikhs believe that the Scriptures must be treated with respect and are required to be stored in a clean place, kept covered when not being used and stored in an elevated location. Any person who comes into contact with either the Scriptures or prayer books should have clean hands, their head covered and should treat the Scriptures with respect.

34.     Since 1708, in keeping with Guru Gobind Singh's direction, the Sikh religion has been guided by the Sikh Scriptures, and by the collectivity of *Amritdhari* Sikhs. In addition to the teachings in the Scriptures, *Amritdhari* Sikhs must strictly follow the Sikh Code of Conduct and Conventions, known as the *Rehat Maryada*, and wear the prescribed physical articles of the faith, which are known as the "five Ks" – *Kes*, *Kanga*, *Kara*, *Kirpan*, and *Kacchera*.

35.     *Kes* means uncut hair.  In keeping with Sikh requirements, *Amritdhari* Sikhs do not cut any of their hair, including the hair on their head, face and body.  Sikhs wear a turban, known as a *dastaar*, to cover their heads.  A Sikh should remain in contact with his turban at all times even when removing or changing turban.  Furthermore, a Sikh should wash his hands before even touching his own turban.  The turban, on average, is five to six yards long.  Male Sikhs also wear a separate pre-turban underneath the turban.

36.     *Kanga* is a wooden comb used for keeping the hair clean and to encourage cleanliness of the mind.  It is worn underneath the turban throughout the day.

37.     *Kacchera* is an undergarment worn to remind Sikhs of their vow of abstinence from adultery.

38.     *Kara* is a cast-iron or steel bracelet, worn on the right wrist, which signifies a Sikh's bondage to Truth and freedom from every other entanglement.  A Sikh is required to wear the *Kara* at all times, including during prayer, work or when eating.

39.     *Kirpan* is a ceremonial sword, symbolizing a vow to protect the weak and helpless and to righteously defend the fine line of the Truth.

40.     An *Amritdhari* Sikh is required to wear the five K's at all times, with only limited exceptions.  For example, in order to avoid being without the *Kacchera*, a Sikh showers with it on.  After completing his shower, a Sikh removes only one leg of the wet *Kacchera*, puts on the first leg of a fresh *Kacchera*, and then removes the other leg of the wet *Kacchera*.

41.     A Sikh's personal life should also involve (a) altruistic voluntary service, (b) leading life according to the Gurus teachings, and (c) meditation on Naam (Divine Substance) and the Scriptures.  Sikhs believe that engaging in honest work is a part of the requirement of altruistic voluntary service.

8

42.     A Sikh should wake up early in the morning – three to four hours before dawn – bathe, meditate and recite the morning prayers.  In addition to morning prayers, a Sikh is suppose to pray in the evening, and often needs to pray in the afternoon in order to finish all the required prayers.  A Sikh should meditate throughout the day.

43.     A Sikh must not consume tobacco, hemp (cannabis) or any intoxicant and should not come into contact, even indirectly, with any of these substances.  Finally, a Sikh must maintain a strictly vegetarian diet and may not consume any meat from an animal (including fish and poultry), gelatin or eggs.

## II.     RESTRICTIONS ON NAVDEEP'S FREE EXERCISE OF HIS RELIGION

44.     Navdeep was sentenced to five years of imprisonment on assault and weapon charges.  On January 26, 2005, Navdeep was taken into custody and sent to the Vernon C. Bain Center, a New York City Department of Correction (DOC) facility.  A correctional officer confiscated the two *Karas* Navdeep brought with him to the facility.  He was then transferred to another DOC facility, the Adolescent Reception and Detention Center (C-74) on Rikers Island.  On February 14, 2005, Navdeep was transferred into the custody of the New York State Department of Correctional Services at Downstate Correctional Facility.

### A.     Incarceration at Downstate: Limiting Navdeep's Religious Practices and His First Hunger Strike

45.     Upon arriving at Downstate, John Doe #1 instructed Navdeep to shave his beard.  DOCS Directive 4914 governing personal grooming requires all inmates to shave their beards during initial processing, and thereafter, allows inmates to grow their beards up to one inch in length.  The policy, however, does not require inmates with sincere religious beliefs that prohibit shaving to comply with these policies if they have a court order.

46.    Navdeep informed John Doe #1 that he was a member of the Sikh religion and that the religion prohibited him from shaving his beard. Moreover, John Doe #1 understood that Navdeep had a court order exempting Navdeep from cutting his hair. John Doe #1, however, explained to Navdeep that he would still have to shave his beard, because the court order referred to Navdeep's hair generally and did not specifically prohibit DOCS from shaving Navdeep's beard. When Navdeep still refused to shave his beard, John Doe #1 issued Navdeep a Tier II misbehavior report and placed him in keeplock for failing to obey a direct order to shave his beard.

47.    In addition, DOCS employees at Downstate took away all of Navdeep's remaining religious articles. A DOCS employee offered Navdeep the opportunity to send his religious books, turbans, the extra pairs of *Kaccheras* and *Kangas* home; otherwise the items would be confiscated or discarded. Navdeep accepted the offer to send the items home. After the package was sealed, a correctional officer instructed Navdeep that he would have to remove the *Kacchera* he was wearing. When Navdeep removed it, the correctional officer threw the *Kacchera* in the garbage.

48.    Navdeep filed grievances and spoke to personnel at Downstate explaining the religious significance of the *Kara* and requesting that he be permitted to wear the *Kara* at all times. His requests were denied. In response to being denied all of his religious articles, on or about February 14, 2005, Navdeep began a hunger strike, refusing both food and water.

49.    On or about February 17, 2005, still on his hunger strike, Navdeep lost consciousness and was transferred to the infirmary. In response, DOCS personnel immediately brought him a *Kacchera, Kara* and *Kanga*. He was permitted to wear the *Kacchera* at all times, but could only wear the *Kara* and *Kanga* during meal time. In addition, a correctional officer

brought Navdeep two religious books, including a Daily-Nitnem (a prayer book). As a result,
Navdeep ended his hunger strike. Navdeep also began wearing a turban in his cell by using his
sheets, but did so without permission from DOCS. Several weeks later, Navdeep was informed
that he had been given permission to wear his turban at all times. Later on, Navdeep's family
was also permitted to bring in for Navdeep the *Sri Guru Granth Sahib*.

50.     After receiving the religious books, Navdeep explained to DOCS personnel his
religious requirements for the proper keeping of these books, and requested that DOCS
employees show the proper respect when touching them.

51.     On February 18, 2005, a disciplinary hearing was held on the first misbehavior
report at which Navdeep again stated that he could not shave his beard because of his religious
beliefs. Lieutenant Wohlrab upheld the misbehavior report, placed Navdeep in keeplock for
thirty days and assessed him a five dollar surcharge. Navdeep appealed the determination to the
Superintendent.

52.     On March 16, 2005, upon Navdeep's release from keeplock, Sergeant V. Limaye
directed Navdeep to shave his beard. Navdeep informed Limaye that shaving his beard would
violate his religion. Nevertheless, Limaye placed Navdeep in keeplock for refusing to obey a
direct order. On March 22, 2005, Lieutenant Wohlrab upheld the misbehavior report, placed
Navdeep in keeplock for thirty days and assessed him a five dollar surcharge. Navdeep appealed
the determination to the Superintendent.

53.     On March 24, 2005, Superintendent Annetts issued two memorandums stating
that he had conducted a discretionary review of the two Tier II Disciplinary Hearings and
directed the Disciplinary Office to release Navdeep from confinement, return any sanctions
imposed and refund the five dollar surcharges. Upon information and belief, the Disciplinary

Office failed to immediately comply and Navdeep remained in keeplock for several more days. On April 14, 2005, Anthony Annucci, Deputy Commissioner and Counsel for DOCS, informed Navdeep that he would forward Navdeep's request for an exemption from DOCS one inch rule to the Deputy Commissioner for Facility Operations with a recommendation that the request be approved.

54.     On April 12, 2005, Correctional Officer J. Sears called Navdeep out for his morning medication. During a "medical call out" an inmate must go to the nurses' station and take his medication. Navdeep, who had previously informed prison officials that he would not consume anything including his medicine until he was issued his *Kara*, told Sears that he could not take his medication without his *Kara*. Sears issued Navdeep his third misbehavior report for failing to obey a direct order. On April 19, 2005, at a disciplinary hearing (held at Fishkill), Lieutenant Milton upheld the misbehavior report, placed Navdeep in keeplock for 10 days and assessed a five dollar surcharge. Navdeep appealed the determination to the Superintendent.

**B.      Transfer to and from Ulster: Mistreatment of Navdeep's Religious Books**

55.     On April 15, 2005, between the issuance of the third misbehavior report and the hearing on the misbehavior report, Navdeep was transferred from Downstate to Ulster. The day before, Correctional Officer Commia packed Navdeep for the transfer. During the course of packing, Navdeep explained to Commia the Sikh requirements for the proper treatment of the Scriptures and other religious books. In response, Commia ripped and damaged the Scriptures and then told Navdeep words to the effect of "shut the f*ck up and let me do what I must."

56.     Navdeep spent two and a half days at Ulster, and was then transferred to Fishkill. On April 18, 2005, the day Navdeep was transferred from Ulster to Fishkill, Navdeep's personal belongings were packed in two property bags, one of which contained his religious books. When Navdeep explained to John Doe #2, a correctional officer at Ulster, that the property bag

contained his religious books and asked that he treat it with respect, John Doe #2 threw the bag on the floor and intentionally and repeatedly kicked the bag.

### C.   Incarceration at Fishkill

57.     On April 18, 2005, shortly after his arrival at Fishkill, Navdeep wrote to the Grievance office and D.S.S. K. Barto informing them that (a) he needed his *Kara* at all times; (b) he needed to perform his morning prayers between the hours of 2:00 a.m. and 6:00 a.m.; and (c) according to the Sikh code of conduct, the Scriptures were required to be covered, stored in a clean place and kept in an elevated location.  On April 25, 2005, Captain Pelc responded to the letter to D.S.S. K. Barto, that Navdeep: (a) would only be allowed to possess his *Kara* during meals, but that DOCS was reviewing whether it was necessary for Navdeep to possess the *Kara* at all times; (b) that he could pray at any time, as long as it did not interfere with facility counts or programming; and (c) that he could cover the Scriptures with a clean cloth and place them on top of his locker.

### 1.   *April 23, 2005 Misbehavior Report*

58.     On April 23, 2005, Correctional Officer Graziano instructed Navdeep to report to the main building porter pool for work detail.  At the time of Graziano's request, Navdeep had just begun his prayers, but after finishing them, he explained to Graziano that he would not comply with the order until he was granted his *Kara*.  Correctional Officer Graziano placed Navdeep in keeplock.  Upon information and belief, Lieutenant Michaels presided over a disciplinary hearing and upheld the charge in the misbehavior report.  Navdeep appealed the determination to the Superintendent, and the Superintendent upheld the misbehavior report.

59.     Following the April 23, 2005 incident, Navdeep met with a Sikh religious authority who told Navdeep that because the *Kara* issue was being pursued through various advocacy groups, he should, temporarily, comply with work orders.

2. *June 6, 2005 Misbehavior Report*

60.     On June 6, 2005, Correctional Officer Lynch ordered Navdeep to clean up some debris and Navdeep complied. Later that morning, Lynch went to check on Navdeep's progress, and instructed Navdeep to pick up cigarette butts on the hand ball court. Navdeep refused, explaining that contact with tobacco, under any condition, was prohibited by the Sikh religion. Nevertheless, Lynch issued Navdeep a Tier III misbehavior report (the most severe misbehavior report) for refusing to follow a direct order and placed Navdeep in keeplock.

61.     After Lynch had placed Navdeep in handcuffs in order to transfer him to keeplock, Lynch and other correctional officers walked Navdeep across the yard to a wall. While Navdeep was facing the wall, Lynch struck Navdeep from behind with an object (possibly his baton) across his neck and shoulder. Navdeep was then repeatedly struck by Lynch and the other correctional officers while he lay on the floor. As a result of this incident, Navdeep sustained injuries to his neck and shoulder. On June 17, 2005, John Doe #3 held a disciplinary hearing. Navdeep was advised that he should have completed the task in violation of his religious beliefs and then filed a grievance. Navdeep was placed in keeplock for three months and assessed a five dollar surcharge. Navdeep appealed the determination to the Commissioner.

62.     On August 26, 2005, more than two months after filing his appeal and after serving more than two-thirds of his punishment, Navdeep was informed that the Tier III misbehavior report for the June 6, 2005 incident was reversed. No explanation was provided as to why the Commissioner reversed the decision.

3. *Denial of Religious Rights in Keeplock and the Second Hunger Strike*

63.     On June 6, 2005, when Navdeep was transferred to the Special Housing Unit, he was not permitted to keep all of his religious books, but was required to leave his prayer book with other belongings in a property bag. As part of the process of transferring Navdeep to

keeplock, the Scriptures he was permitted to bring with him were once again damaged.  In addition, Navdeep was again denied the right to wear his *Kara*.

> a.   *DOCS Denied Navdeep his Kara and Intentionally Damaged the Kara*

64.    As a result of the treatment of his religious books and the denial of *Kara*, on or about June 6, 2005, Navdeep began his second hunger strike.  On June 8, 2005, DOCS personnel gave Navdeep his *Kara*, for a short period of time so that he could consume water.  On June 10, 2005, Navdeep was again given his *Kara* so that he could consume water.  Despite drinking that day, on June 10, 2005, Navdeep lost consciousness and was transferred to the infirmary in the RMU.

65.    Around this time, Navdeep was told by DOCS personnel that he would be provided his *Kara* on a regular basis for meals.  On or about June 17, 2005, after consulting with religious authorities and being instructed to consume some food, Navdeep agreed to modify his hunger strike to consume a liquid diet, including Ensure, a liquid supplement.  He has, however, refused to consume solid food in protest of the treatment of his religious articles and books as well as DOCS denial of his right to possess other religious articles.  Navdeep has slowly increased his caloric intake over the last couple of months, but remains on a liquid diet pending the outcome of his religious claims.

66.    During late June and early July, some correctional officers only allowed Navdeep ten to fifteen minutes to consume his Ensure, while others denied Navdeep the *Kara* because he was using his allotted time to recite grace prayers before eating his meal and not limiting his time with the *Kara* to eating.  On July 8, 2005, Pelc issued a memo clarifying that Navdeep would be entitled to wear the *Kara* for thirty minutes per meal regardless of whether or not Navdeep chose

to eat with the *Kara*. Correctional officers, however, continue to deny Navdeep the full thirty minutes with the *Kara* during meal times.

67.     In addition to denying Navdeep the *Kara*, DOCS personnel damaged the *Kara*. Upon information and belief, in April 2005, DOCS personnel intentionally burned the *Kara*, leaving a black burnt mark on it. Similarly, in July 2005, DOCS personnel bent the *Kara* out of shape. These incidents took place in between meals, at a time when DOCS personnel were in possession of the *Kara* outside the view of Navdeep. However, upon information and belief, Correctional Officer Stewart was responsible for some of the damage done to the *Kara*. Damaging the *Kara* is considered a sacrilege.

68.     Furthermore, correctional officers imposed arbitrary and capricious rules upon Navdeep concerning his use of the *Kara*. For example, certain correctional officers have allowed Navdeep to have his *Kara* to consume his lunch during legal and family visits, while others have denied him food during these visits.

69.     DOCS response to Navdeep's request to wear the *Kara* at all times was, in part, to determine on its own, the significance of the *Kara* to Navdeep's religious beliefs. For example, on April 25, 2005, Pelc wrote to Navdeep that DOCS was reviewing "the necessity of your possessing" the *Kara* "at all times." Similarly, on May 16, 2005, Pelc wrote to Navdeep stating that "I've come across nothing in my research, albeit incomplete at this time, which states you cannot eat or take medication without wearing your Kara."

70.     On several occasions, despite instructions by Pelc to the contrary, correctional officers have and continue to personally handle the *Kara*. Because of its holy nature, anyone coming into contact with the *Kara* must have clean hands and treat it with the proper respect. Several of the correctional officers refused to accommodate these religious requirements.

Navdeep repeatedly complained to Pelc and the Inmate Grievance Program that correctional officers, despite clear instructions to the contrary, were personally handling the *Kara*, and generally treating it with disrespect.

71.     DOCS continues to deny Navdeep the right to possess the *Kara* except for thirty minutes during breakfast, lunch and dinner. Navdeep is still housed in the RMU, where he shares a room with as many as three other inmates. Pursuant to the current procedures, when Navdeep's food arrives, a correctional officer brings him the *Kara* in an envelope. Navdeep is permitted to remove the *Kara* from the envelope, recite his grace prayers, and then consume his meal. Approximately thirty minutes later, the correctional officer returns with the envelope, and Navdeep returns the *Kara*.

72.     Upon information and belief, DOCS can accommodate Navdeep's request to wear his *Kara* at all times, as DOCS has accommodated similar requests from other religions. For example, inmates that observe other religions may wear religious pendants on a metal chain, and Native Americans may wear the Native American Rosette on a fabric or leather cord.

b.     *Treatment of Religious Scriptures and Books*

73.     When transferred to keeplock, Navdeep was not provided an appropriate place to keep his Scriptures and other religious books. In his room, Navdeep only had a bed, a toilet and a sink, but did not have a table, locker or other piece of furniture on top of which he could keep his Scriptures. As discussed above, a Sikh must place the Scriptures in a location of respect; the Scriptures must rest in a clean location on an elevated level. In order to comply with his religious requirements, Navdeep removed his mattress from his bed and placed the Scriptures on the frame. This way, he was resting on a mattress on the floor, while the Scriptures were on a higher level than he, in a clean location (the mattress itself was stained with urine).

74.    On June 7, 2005, the day after Navdeep was transferred to keeplock, Correctional Officer Mendoza instructed Navdeep to place the mattress back on the bed. At the time that Mendoza walked into his cell, Navdeep was in the middle of his prayers and did not respond. Navdeep later approached Mendoza to discuss the issue, but Mendoza refused, stating that it was too late. Mendoza issued Navdeep a tier II misbehavior report for refusing to obey a direct order.

75.    On or about June 8, 2005, Navdeep met with Captain Pelc about his various requests for religious accommodations. At that meeting, Navdeep discussed with Pelc the incidents with Mendoza, and Pelc told Navdeep that he would address the problem.

76.    According to a misbehavior report, on June 8, 2005, Correctional Officer DiGirolamo instructed Navdeep to place his mattress on the bed frame. DiGirolamo issued Navdeep a tier II misbehavior report for refusing to obey a direct order.

77.    According to a misbehavior report, on June 10, 2005, Correctional Officer Monzillo instructed Navdeep to place his mattress on the bed frame. Despite Pelc's assurances that the problem would be dealt with, Navdeep was not offered any religious accommodation by DOCS personnel. As on the prior two occasions, Navdeep was issued a Tier II misbehavior report for refusing to obey a direct order.

78.    On June 21, 2005, disciplinary hearings were held for the three behavior report issued between June 7 and June 10 concerning Navdeep placing his mattress on the floor of his cell. The written determinations stated that Navdeep should obey direct orders promptly without argument. At the hearing, Navdeep explained his religious belief and that Pelc had told Navdeep that he would deal with the situation. John Doe #4, the hearing officer, did not accept either defense, and denied Navdeep the opportunity to call Pelc to testify on his behalf. For each

misbehavior report, Navdeep was placed in keeplock for 30 days (20 days of which were suspended) and assessed a five dollar surcharge. Navdeep appealed the determination to the Superintendent, and the Superintendent upheld all three determinations.

### c. *DOCS Treatment of Navdeep in Keeplock*

79.     On or about July 10, 2005, Navdeep pressed the intercom in his room and requested that the nurse turn off the light in the inner gallery. Two correctional officers came into Navdeep's room and told him he would have major problems if he pressed the intercom button again. When Navdeep responded by asking if he was prohibited from using the intercom, John Doe #5 told Navdeep not to press the intercom while he was on duty. He added words to the effect of "your doing your hunger fast religious crap, I don't care. No one is telling you to starve yourself."

80.     On July 11, 2005, Correctional Officers Tabor, Wittwer and others performed an emergency search for contraband. As part of the search, Navdeep was placed in handcuffs escorted by Tabor to another room and from that room to a guidance counselor room. Because of his weakened condition as a result of his previous hunger strike and his then current liquid diet, Navdeep was not able keep up the pace and told Tabor, but Tabor ignored him and dragged him down the hall. When they arrived at the second room, Tabor violently pushed Navdeep and told him to "stand by the wall and don't say a word before I bash your head into the wall." As a result of the push, Navdeep sustained injuries to his back. No contraband was located during the search.

81.     Upon his return to his cell, Navdeep found the Scriptures and prayer books had been disrespected by being wrapped in a bed sheet and stuck under his remaining bedding. In addition, two of his prayer books were later discovered hidden underneath his bed. Finally, the

two *Kaccheras* Navdeep was not wearing at the time of the search were missing, and were later located in the RMU's laundry.

82.     While at Fishkill, Navdeep has been spat on, hit and ridiculed for his religious beliefs by DOCS personnel. On July 14, 2005, Navdeep wrote to Superintendent Mazzuca informing him of this abuse.

83.     On July 18, 2005, Navdeep received his property bag in the RMU. Upon removing his prayer book from the property bag, it was torn, misshapen and wet. Nothing else in the bag was wet. Upon information and belief, John Doe #6 intentionally wet the prayer book.

84.     On July 18, 2005, during the night shift, Correctional Officer K. Emminger and R.N. J. Conners came into Navdeep's room to check his vital signs. At the time, Navdeep was praying, and Emminger began mocking Navdeep's prayers by repeatedly saying "Ohm, Ohm." The nurse asked whether Navdeep wanted to have his vitals checked, and while Navdeep could not respond verbally because he was in the middle of prayers, he shook his head no. The nurse understood the response, but Emminger insisted that Navdeep had to respond verbally. When Navdeep once again responded by shaking his head, Emminger yelled at him an anti-religious remark, and left, slamming the door.

85.     On or about July 2005, Navdeep requested milk. Navdeep's medical chart provided that he was entitled to receive milk upon request. Correction Officer K. Emminger came into his room and told Navdeep that he understood Navdeep was doing some "religious bullshit," but that unless he was coming from the hospital, he could not have milk.

III.    **Attempts to Address Complaints and Requests for Religious Accommodations Through the Prison System**

86.     In an attempt to address the above incidents, Navdeep has filed more than sixteen grievances with the Inmate Grievance Program. He has appealed the determination of the

Inmate Grievance Review Committee on these grievances to the Superintendent, and the Superintendent's decision to the Central Office Review Committee.

87.     Navdeep has also appealed all of his misbehavior reports either to the Superintendent (for Tier II misbehavior reports) or to the Commissioner (for Tier III misbehavior reports).

88.     Navdeep was also instructed by DOCS personnel, both verbally and in writing, to address concerns directly to Captain Pelc. For example, on July 14, 2005, Inmate Grievance Program supervisor Michelle P. Stone wrote to Navdeep that he would have to write to Pelc for clarification of when Navdeep was permitted to have his *Kara* and that questions about the two religious articles, the *Kacchera* and the turban, should be addressed to Pelc "as they involve security." Similarly, in response to a grievance Navdeep filed on August 15, 2005, requesting times when he could pray, Stone responded that Navdeep would need to address those concerns directly to Pelc. As a result, Navdeep has repeatedly written to and spoken with Captain Pelc and/or Superintendent Mazzuca about the restrictions on his religious practices. The following are additional religious accommodations that Navdeep has requested:

A.     **Turbans**

89.     On August 26, 2005, Navdeep filed a grievance concerning the pre-turban and turban. In the grievance, he requested permission to possess turbans that were at least three meters long so that he could properly tie the turban. At the time, Navdeep was permitted to possess a cloth to form a turban that was thirty inches by thirty-six inches. Inmates that ascribe to other religions are permitted religious items made of cloth that are larger than the size of Navdeep's turban. For example, an Islamic female inmate may possess a *Khimar* that is four feet by four feet. Similarly, a Jewish inmate may possess a *Tallit* that is five and a half feet by five and a half feet. On October 5, 2005, the Central Officer Review Committee denied Navdeep's

request.

90.     On September 12, 2005, Navdeep filed a grievance requesting permission to wear an orange, blue or black turban.  As Navdeep explained in the grievance, these colors have religious significance.  DOCS permits other religions to wear head coverings without restricting the colors worn.  For example, DOCS directive 4202 states that "there are no color prohibitions" on the *Kufi* or *Yarmulke*.  Similarly, DOCS amended directive 4202 to allow Rastafarians to wear a *Tsalot-Kob* that is either multi-colored or single colored. On October 12, 2005, the Central Office Review Committee denied the request, stating that the color of the turban was a personal choice, not a religious requirement.

91.     On September 18, 2005, Navdeep filed a grievance requesting six turbans so that he could wash and change the turban daily.  At the time, Navdeep was only permitted to possess two turbans.  On October 19, 2005, the Central Office Review Committee denied the request.

**B.      Sikh Diet**

92.     On August 25, 2005, Navdeep filed a grievance requesting wrapped, non-meat, non-egg, non-gelatin meals.  Under normal conditions, a Sikh's diet should not contain any form of meat from animals (including fish and poultry), eggs or gelatin.  The Central Office Review Committee responded that Navdeep was permitted to eat the religious alternative menu, but stated that the religious alternative menu included eggs.  Upon information and belief, DOCS provides other religions diets that comply fully with their religious requirements.  For example, DOCS provides a kosher kitchen at Fishkill which serves a kosher meal to kosher inmates. DOCS has not offered any similar accommodations to Navdeep.

**C.      Kacchera**

93.     On June 11, 2005, Navdeep wrote to Pelc, explaining that a Sikh showers with his *Kacchera* on, and at the end of the shower, changes into the new *Kacchera* by removing one leg

from the wet *Kacchera*, putting on one leg of the dry *Kacchera*, and then removing the other leg

of the wet *Kacchera*.  Navdeep asked Pelc how he could shower daily, if laundry was only once

a week and he was not permitted to hang his wet *Kacchera* up to dry.  Pelc never responded to

Navdeep.

        **D.**     ***Khanda***

94.     While Navdeep was at Downstate, he requested permission to wear a *Khanda*, a

Sikh religious pendant, but was told that because the pendant was not a cross, he was not

permitted to have it.  On August 31, 2005, while at Fishkill, Navdeep filed a formal grievance

requesting permission to wear a *Khanda*.

95.     The *Khanda* is the universal Sikh symbol composed of a central, straight edged

sword, symbolizing truth surrounded by two curved swords representing temporal power and

authority.  The pendant is a couple of inches in height and width and need not contain any sharp

edges.  DOCS directive 4202 provides that an inmate may wear a religious pendant underneath

his clothing.

96.     On October 5, 2005, the Central Office Review Committee denied the request to

wear a *Khanda*, asserting that a pendant in the shape of a sword raised concerns about the safety,

security and good order of the facility.

        **E.**     **Procedures During Searches**

97.     On July 14, 2005, in a letter to Pelc, Navdeep requested permission to remain in

contact with his *Kacchera* and turban during searches.  Pelc responded that, upon a visitation,

correctional officers had a duty to physically and visually inspect the *Kacchera* and turban.

98.     Upon information and belief, DOCS could have avoided the mistreatment of

Navdeep's religious items, including his Scriptures, during searches.  For example, DOCS allows

inmates who ascribe to other religions to avoid a physical inspection of certain religious items –

DOCS personnel do not touch a Native American's medicine bag. Rather, during a search, a Native American inmate opens the medicine bag and a correctional officer visually inspects the contents of the medicine bag.

### F.    Prayer Times and Related Requests

99.    In July 2005, Navdeep repeatedly wrote to Mazzuca and Pelc requesting religious accommodations so that he could recite his prayers according to Sikh tradition. His requests included permission to shower in the morning, a schedule of when he could pray so that his prayers did not interfere with facility programming, a light so he could recite morning prayers and permission for his family to bring in a watch so that he would know when it was time to pray. On July 29, 2005, Pelc denied Navdeep's request to shower in the morning and stated that the lights would remain off after 11:00 p.m. until the morning shift.

### G.    Digital Picture of Navdeep

100.   On or about September 6, 2005, Navdeep requested that DOCS remove the digitally enhanced image of Navdeep without a beard and replace it with a picture of Navdeep with his beard. As Navdeep explained in his grievance, a picture of him without some or all of his hair is to a Sikh, an indecent photograph. On October 5, 2005 the Central Office Review Committee denied the request.

## FIRST CLAIM

### Declaratory Judgment, 28 U.S.C. §§ 2201, 2202

#### (Against All Defendants)

101.   Paragraphs 1 through 99 are incorporated as if set forth fully herein.

102.   An actual and substantial controversy exists between Navdeep and defendants as to their respective legal rights and duties. Navdeep contends that defendants' restrictions on his religious practices are illegal under either: (a) the United States Constitution, First Amendment;

(b) 42 U.S.C. 2000cc *et seq.*; and/or (c) the New York State Constitution.  On information and belief, defendants contend that the restrictions are valid.

103.   Navdeep requests that the Court declare his right to practice his religion, Sikhism, and DOCS legal obligation to accommodate his religious practices.  Specifically, Navdeep requests that the court declare that Navdeep is entitled to:

a.   possess and wear his *Kara* at all times;

b.   possess up to six turbans of a length sufficient to tie the turban in one of the traditional manners (at a minimum, three meters long);

c.   wear turbans that are orange, blue or black;

d.   wear his *Kacchera* at all times consistent with his religious beliefs and shall be entitled to possess more than three *Kaccheras* so that he can change and wash his *Kacchera* on a daily basis;

e.   wash and dry his *Kaccheras* and turbans in his cell;

f.   remain in contact with his religious articles at all times, including during searches and transfers;

g.   be present when his religious articles and books are searched or otherwise touched under normal circumstances;

h.   possess a *Khanda* and wear it in a manner consistent with Directive 4202;

i.   maintain his religious Scriptures and other religious books in a manner consistent with his religious beliefs including wrapping them in a piece of cloth, and storing them in a clean and elevated location;

j.   have DOCS employees treat the Scriptures and other religious books with respect and to possess his religious articles and books without DOCS employees damaging them;

k.   set times during which to pray on a daily basis, including performing morning prayers three to four hours before dawn;

l.   to shower in the morning before prayers and have a light on in his cell in order to pray before dawn;

m.   a vegetarian diet that complies with Sikh religious requirements, including the possible provision of food by a third party more familiar with Sikh requirements;

n.      work assignments that do not require him to violate his religious beliefs including the Sikh prohibition on contact with either tobacco or alcohol;

o.      be free of religious and racial harassment or physical abuse by correctional officers;

p.      an exemption from DOCS's grooming rules concerning the length of his beard;

q.      have his misbehavior reports reversed and expunged from his record;

r.      have Directive 4202 amended to cover Sikh practices so that Navdeep's rights will be protected even if he is moved to another facility.

## SECOND CLAIM

Violation of Religious Land Use and Institutionalized Person Act, 42 U.S.C. §§ 2000cc *et seq.*

(Against All Defendants)

104.    Paragraphs 1 through 99 are incorporated as if set forth fully herein.

105.    Under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1, "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -- (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

106.    As discussed above, defendants have imposed on Navdeep's religious exercise a substantial burden, which either does not further a compelling governmental interest or is not the least restrictive means of furthering a compelling governmental interest.  Defendants have accordingly violated Navdeep's rights under RLUIPA.

107.    Navdeep requests an injunction prohibiting defendants and other DOCS personnel from infringing upon his religious rights and nominal, compensatory and/or punitive damages against defendants in an amount to be established at trial.

## THIRD CLAIM

Violation of the First and Fourteenth Amendments, and 42 U.S.C. § 1983

(Against Defendants Goord, Mazzuca, Zwillinger, Annetts, Commia, Lynch, Mendoza,

DiGirolamo, Monzillo, Stewart, Tabor, Emminger, Stone, John Does #2-6)

108.    Paragraphs 1 through 99 are incorporated as if set forth fully herein.

109.    The First Amendment to the United States Constitution provides: "Congress shall

make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."

110.    By severely restricting plaintiff's religious practices, defendants have denied, and

continue to deny, plaintiff his right to the free exercise of his religion as guaranteed  by the First

Amendment to the Constitution of the United States.

111.    Plaintiff requests an injunction prohibiting defendants and other DOCS personnel

from infringing upon his First Amendment rights and nominal, compensatory and/or punitive

damages against defendants in an amount to be established at trial.

## FOURTH CLAIM

First Amendment Retaliation, and 42 U.S.C. § 1983

(Against Defendants Stewart, Emminger, Tabor, Lynch and John Does #5 & #6)

112.    Paragraphs 1 through 99 are incorporated as if set forth fully herein.

113.    The First Amendment to the United States Constitution provides: "Congress shall

make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or

abridging the freedom of speech, or of the press; or the right of the people peaceably to

assemble, and to petition the Government for a redress of grievances."

114.    As described above, defendants have severely restricted Navdeep's ability to

practice his religion and have placed him in segregation for asserting his rights.

115.    Furthermore, as described above, defendants have physically and verbally abused Navdeep and damaged his religious articles in response to Navdeep's requests that his religious needs be accommodated and his religious books and articles be treated with respect.

116.    As a result, defendants have retaliated against Navdeep for his exercise of the right to practice his religion and the right to petition the Government for a redress of grievances.

117.    Navdeep requests an injunction prohibiting defendants and other DOCS personnel from further retaliating against him for asserting his religious rights and nominal, compensatory and/or punitive damages against the defendants in an amount to be established at trial.

## FIFTH CLAIM

Violation of New York State Constitution, Article 1, Section 3, and 42 U.S.C. § 1983

(Against Defendants Goord, Mazzuca, Zwillinger, Annetts, Commia, Lynch, Mendoza,

DiGirolamo, Monzillo, Stewart, Tabor, Emminger, Stone, John Does #2-6)

118.    Paragraphs 1 through 99 are incorporated as if set forth fully herein.

119.    Article 1, Section 3 of the New York State Constitution provides:  "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind."

120.    By severely restricting Navdeep's ability to practice his religion, defendants have denied, and continue to deny, Navdeep the right to the free exercise of his religion as guaranteed by the New York State Constitution.

121.    Plaintiff requests an injunction prohibiting defendants and other DOCS personnel from infringing upon his New York State Constitutional rights.

## SIXTH CLAIM

Violation of Eighth and Fourteenth Amendments, and 42 U.S.C. § 1983

(Against Defendant Lynch and Tabor)

122.   Paragraphs 1 through 99 are incorporated as if set forth fully herein.

123.   The Eighth Amendment prohibits the imposition of "cruel and unusual punishments" including the use of excessive force.

124.   As alleged above, on June 6, 2005, Correctional Officer Lynch used excessive force when he repeatedly struck Navdeep. Navdeep refused to pick up cigarette butts because of a sincere religious belief. Navdeep was not involved in a physical confrontation with Lynch at the time, and after placing Navdeep in handcuffs there was no reason to have used force on Navdeep, let alone, to have repeatedly hit him. As a result of the forced used, Navdeep sustained an injury to his neck and shoulder.

125.   As alleged above, on July 11, 2005, Correctional Officer Tabor used excessive force when he violently pushed Navdeep into the guidance counselor's office. In early June, Navdeep had undertaken a hunger strike to protest the limitations DOCS imposed on his religious practices. After the hunger strike, Navdeep remained on a liquid diet. As Navdeep explained to Correctional Officer Tabor, as a result of his diet, Navdeep was too weak to keep up with Tabor. Under the circumstances, there was no reason to have used force, let alone, to have pushed Navdeep violently. As a result of the push, Navdeep sustained an injury to his back.

126.   Navdeep is entitled to compensatory and punitive damages as a result of the injuries incurred.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands trial by jury of all issues properly triable thereby.

**PRAYER FOR RELIEF**

Plaintiff therefore respectfully requests that the Court enter judgment as follows:

1. A declaration that plaintiff is entitled to exercise his religious rights as set forth in paragraph 102 above.

2. A preliminary and final injunction requiring DOCS to amend Directive 4202 to cover Sikh practices and restraining defendants and all DOCS personnel from:

    a. restricting Navdeep's religious practices;

    b. denying Navdeep the right to have six turbans of a length sufficient to tie the turban in one of the traditional manners (at a minimum, three meters long);

    c. denying Navdeep the right to wear turbans that are orange, blue or black;

    d. denying Navdeep the right to possess more than three *Kaccheras* so that he can change and wash his *Kacchera* on a daily basis;

    e. denying Navdeep the right to wash and dry his *Kaccheras* and turbans in his cell;

    f. denying Navdeep the right to possess and wear his religious articles at all times, including during searches and transfers;

    g. denying Navdeep the right to wear a *Khanda*;

    h. denying Navdeep the right to maintain his religious Scriptures and other religious books in a manner consistent with his religious beliefs including wrapping them in a piece of cloth, and storing them in a clean and elevated location;

    i. touching or disrespecting Navdeep's religious articles and books, or in the alternative, at a minimum, requiring DOCS personnel to wash their hands before coming into contact with these items;

    j. touching, searching or inspecting Navdeep's religious articles and books outside of his presence unless exigent circumstances demand otherwise;

    k. from treating Navdeep's religious items and practices with disrespect;

    l. using a photograph of Navdeep without a beard for routine identification purposes;

m.      denying Navdeep an opportunity to pray during set times on a daily basis, including performing morning prayers three to four hours before dawn;

n.      denying Navdeep the opportunity to shower in the morning before prayers and have a light on in his cell in order to pray before dawn;

o.      providing Navdeep with a diet that fails to comply with Sikh religious requirements, including providing him a diet that contains eggs;

p.      giving Navdeep work assignments that require him to violate his religious beliefs including the Sikh prohibition on contact with tobacco;

q.      enforcing any of DOCS grooming rules against Navdeep that require an inmate to cut any part of his hair;

r.      retaliating against Navdeep for exercising his constitutional and statutory rights, including but not limited to placing Navdeep in segregate housing or transferring him to another facility transfer;

s.      harassing or physically abusing Navdeep.

3.      Compensatory damages in an amount to be proven at trial;

4.      Punitive damages in an amount to be proven at trial;

5.      Costs and reasonable attorneys' fees pursuant to 42 U.S.C. §1988(b);

6.      Such additional and further relief as the Court deems just and equitable.


Dated: November 16, 2005                    O'MELVENY & MYERS LLP


                                            By: _____
                                                Andrew J. Frackman (AF4276)
                                                Kenneth Marvet (KM8800)

                                            Steven Rubin (SR7887)
                                            UNITED SIKHS
                                            481 Eighth Avenue, Suite 10001
                                            New York, NY 10001


                                            Attorneys for Plaintiff
                                            NAVDEEP SIGH